E. J. CALLAN, Appellant,

v.

GREAT NORTHERN RAILWAY COMPANY, a corporation, Appellee.

No. 17131.

United States Court of Appeals
Ninth Circuit.

July 31, 1961.

Clifford D. O'Brien, Portland, Or., for appellant.

Clark A. Eckart, R. Paul Tjossem, Woodrow L. Taylor, Thomas J. Wetzel, Seattle, Wash., for appellee.

Before HAMLIN, MERRILL and KOELSCH, Circuit Judges.

HAMLIN, Circuit Judge.

E. J. Callan, appellant herein, was employed as a switch foreman by the Great Northern Railway Company, appellee herein. On May 19, 1956, a train of which he was in charge collided with a string of boxcars, causing extensive damage. An investigation into the cause of the collision was made by the railroad, and as a result thereof Callan and the locomotive engineer were discharged. The balance of the crew was suspended for a period of 30 days.

Callan appealed his dismissal to the National Railroad Adjustment Board, herein called the NRAB or the Board. A hearing was held; the Board determined that the action taken by the railroad against Callan was excessive; and it ordered that he be reemployed and compensated for lost time less a 60-day suspension period which the Board felt was sufficient punishment for his conduct. The Board's award became effective on January 17, 1958. In compliance with the order of the Board the railroad placed appellant's name at its former position upon the rail-road seniority roster and paid him for his time lost from the day of the accident to January 27, 1958, less the 60-day suspension period.[1] Callan was given a physical examination by the railroad physician on January 27, 1958, to determine whether he was then physically qualified to return to work (20 months having elapsed since his former employment). He was found to be physically disqualified for duty as a switchman or a switch foreman by reason of hypertension, respiratory complications and a moderately severe arthritic condition of the middle back. He was notified of his disqualification and retained on the seniority roster. The letter from the railroad contained the following paragraph:

"Due to the fact that you were unable to pass required physical examination that was given you on January 27, 1958, you have been granted an indefinite leave of absence effective January 27, 1958, and you will be withheld from service until such time as you can pass a physical examination that is satisfactory to Great Northern's Chief Medical Officer."

Callan never requested any further physical examination by the railroad.

About a year after Callan had received the back pay, he brought a personal injury action against the railroad claiming that as a result of the collision of May 19, 1956, he had suffered low back injuries and aggravation of a pre-existing arthritic condition. He alleged that this condition was permanent and that he was therefore physically incapacitated from performing the duties of switchman or switch foreman. This action was voluntarily dismissed by Callan when it came on for trial in September of 1959, no payment being made at that time by the railroad to Callan.

In October of 1959 Callan filed an action in the United States District Court for the Western District of Washington seeking the enforcement of the award of the NRAB. This petition was filed under

---

1. The net amount paid Callan was $5281.90.

45 U.S.C.A. § 153, the pertinent provisions of which read as follows:

"(o) In case of an award by any division of the Adjustment Board in favor of petitioner, the division of the Board shall make an order, directed to the carrier, to make the award effective and, if the award includes a requirement for the payment of money, to pay to the employee the sum to which he is entitled under the award on or before a day named.

"(p) If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner * * * may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the carrier operates, a petition * * * for * * * relief * * *. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the * * * Board shall be prima facie evidence of the facts therein stated * * *. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment * * * as may be appropriate to enforce or set aside the order of the * * * Board."

In the petition Callan claimed that he was physically qualified to perform his duties as a switchman and that by not reinstating him after January 27, 1958, the railroad had failed to comply with the order of the Board. The railroad in its answer alleged that it had complied with the order of the Board and stated that the only reason that Callan had not been returned to work was that he was physically unfit to perform his duties.

The railroad also filed a cross-petition asking the court to set aside the award of the Board on the ground that the award and the moneys paid pursuant thereto were obtained by fraud and deceit. The trial in the district court was before a jury, which found against Callan on his request for reinstatement but in his favor on the railroad's petition to set aside the award of the Board. From the adverse jury verdict Callan appealed to this court, which has jurisdiction of the appeal under 28 U.S.C.A. §§ 1291 and 1294.

During the trial appellant called as a witness Dr. L. J. Cohen. It appeared that Dr. Cohen saw and examined him for the first time in September of 1959 (twenty months after the examination by the railroad doctors) and for the second time on August 8, 1960 (during the trial). He also had examined X-ray films of Callan taken by a railroad doctor on January 27, 1958. He testified as to what the X-rays disclosed, and then the following took place:

"Q. [By appellant's attorney]: Dr. Cohen, from the X-ray film which you have examined, can you say whether the subject of that film was at the time of those X-rays in January, 1958, disabled in the low back from performing work as a switchman and switch foreman?

A. I can.

Mr. Taylor [Appellee's attorney]: I will object to the form of the question. I thought this was a matter which was before the Court before.

The Court: Yes, that objection is sustained, with leave to discuss that in the absence of the jury."

The jury then retired for the day, and in the absence of the jury Callan's counsel made an offer of proof stating that Dr. Cohen would testify that from his physical examinations of Callan in September, 1959, and on August 8, 1960, and from an examination of the X-ray films which were taken on January 27, 1958, that Callan was not on January 27, 1958, disqualified from performing work as a switchman or switch foreman, and that the so-called high blood pressure condition of Callan could not medically have existed in January, 1958. The objection was made by counsel for the railroad that

Dr. Cohen could not testify to a condition which existed 20 months prior to the time that he examined Callan for the first time; that there was no showing that Dr. Cohen was familiar with the medical standards of the railroad; and that he could not possibly know whether Callan was disqualified by those railroad standards some 20 months prior to the examination.

There was considerable discussion by court and counsel concerning the offer of proof and whether the testimony would be admissible. At first the judge indicated that he would not allow the testimony, but it became apparent later that his decision was based on his belief that the examination of January, 1958, had been conducted by an NRAB physician and not by a railroad physician. As soon as he became aware of his error, he decided that it would be necessary to re-examine his position. He said:

> "You will please meet with the Court at 9:30 in the morning with your authorities. I ask both of you to do that. Your position certainly is not unassailable, Mr. Taylor. I am sure that I understood your contentions and I thought I had a right to understand them, but I find that now there is some question about that. * * * I am certain that I have not gotten the correct picture. I have not determined finally what effect it will have on the ruling. * * *
> *Get me the law."* [Emphasis added]

Court was thereupon adjourned until the next morning, and we feel that these final comments of the trial judge clearly show that he had not yet made his mind up on the question of the *admissibility* of the doctor's testimony.

On the following morning at 9:30 when the discussion was to continue, counsel for appellant said, "Well, if your Honor please, after the adjournment yesterday the plaintiff and defendant entered into a stipulation to the effect that the defendant would waive any further cross-examination of the testimony and stipulate that if permitted to answer,—if your Honor permitted him to answer,—Dr. Cohen would testify that as of August the 8th, 1960 he did not find any disabling physical condition." Counsel for appellant further informed the court that Dr. Cohen was not in attendance as a witness that day, he having been permitted to go back to Portland to perform some surgical duties. Counsel then argued before the court in the absence of the jury as to whether the proposed stipulation of counsel was admissible, and after a full discussion of this matter the court said, "The Court approves the stipulation and the Court rules that the question is competent and may be dealt with in accordance with the stipulation." The jury were then called back into court and the stipulation of counsel was read to them.[2]

It thus appears that after the district judge had indicated that he would consider the matter further upon the following morning when authorities from counsel had been presented, that counsel for Callan voluntarily abandoned his offer of proof, entered into a stipulation with opposing counsel as to what Dr. Cohen would testify to, and then permitted Dr. Cohen to return to Portland. Dr. Cohen did not appear further in the case as a witness. We can see no merit in appellant's contention that the trial court erroneously refused to allow Dr. Cohen to testify as to the facts set out in the offer of proof.

Callan's second specification of error is that appellee was permitted to examine witnesses concerning violations of company rules, which particular violations were not set forth in the pretrial order. The pretrial order set out that it was one of the contentions of the railroad

---

2. "Ladies and gentlemen of the jury, it has been stipulated between Counsel for the railroad and ourselves, number one, that Counsel for the railroad waive cross-examination of the testimony thus far given by Dr. Cohen, and number two, that if permitted Dr. Cohen would testify that as of August 8, 1960 he did not find any disabling physical condition. The Court has ruled that the testimony would have been permitted if Dr. Cohen were here to give it."

that in the original investigation Callan and other employees of the railroad had refused to admit certain specific rule violations; but that later, after the hearing before the Board and in the action filed by Callan against the railroad for personal injuries, they had admitted such violations. The pretrial order also ordered that there be admitted in evidence upon the trial the following:

"5. Copy of Great Northern Railway Company Schedule of Rates, Rules and Regulations for Switchmen.

"6. Copy of The Consolidated Code of Operating Rules.

"7. Copy of Great Northern Railway Company Rules and Instructions Governing Operation, Inspection and Maintenance of Air Brake and Air Signal Equipment, Handling Locomotives, Dynamic Braking, Train Handling, General Rules.

"8. Copy of Great Northern Railway Company Operating Department Safety Rules, Governing Employees in Train, Engine and Yard Service.

"9. Copy of Great Northern Railway Company Manual of Instructions to Conductors, Train Baggagemen and Yardmasters Relative to Handling Freight, Passenger, Mail, Baggage and Milk Traffic."

On trial, Callan's counsel interrogated him about some of these rules and now complains that appellee was permitted to interrogate Callan and other witnesses as to other provisions of these rules. We think that this examination was proper and that there was nothing in the pretrial order which prevented such procedure.

In specification of error number three, Callan complains that the issue of his claimed fraudulent testimony before the NRAB was erroneously submitted to the jury. It will be remembered that after the railroad's investigation of the collision in question, Callan was discharged and that he then petitioned the NRAB contending that he was wrongfully discharged. He contended before the Board that he had not violated any company rules and that no liquor was involved at the time of the accident. Other witnesses, including the engineer and the fireman, gave similar testimony before the Board. At various times after their testimony before the Board, one witness after another admitted that he had lied in his testimony before the Board; and it was not until April, 1959, over a year after the company had paid the Board's award, that Callan admitted in his deposition in the personal injury action that "there was drinking on the evening of this collision."

■■ Six months later, in October, 1959, Callan filed his petition in the district court alleging that the railroad had not complied with the order of the NRAB and asked the district court to make its order reinstating him as switch foreman and requiring that he be paid his wages from January 28, 1958. The act under which Callan filed his petition [45 U.S. C.A. § 153(o) and (p)] provides that such a suit in the district court shall proceed in all respects as other civil suits "except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated * * *." The Act further provides that "the district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board." In Boos v. Railway Express Agency, 253 F. 2d 896, 897 (8th Cir. 1958), it was held: "The trial in the District Court is a trial de novo." This being true it was proper for the railroad to file a cross-petition alleging that the order of the Board had been obtained by fraud and deceit and asking that it be set aside. This was the procedure followed by the railroad and we hold that the issue of fraud was properly before the jury and that it was the duty of the court to instruct the jury upon that issue.

■ Under specification number four appellant contends that it was error for

the district court to refuse to give petitioner's requested instruction No. 12.[3] The instruction given by the district court upon this phase was as follows:

"The jury is instructed that if the managing agent had knowledge of such facts as to give him actual knowledge of the alleged fraud and if such agent or representative of the corporation was in the course of his normal corporate duty, acting in a managerial capacity for the corporation, and if under those conditions he made the actual payment by the corporation, then his doing so would be evidence of the corporation's intention to waive its objection to the fraud, if any, and if he did so the corporation cannot thereafter recover such payment from the allegedly defrauding person on account of such alleged fraud."

The evidence disclosed that while prior to the time of paying the award the railroad had received some statements from third persons indicating that there had been some drinking by members of the crew, at that time all of the members of the crew had testified positively under oath to the contrary. It was not until many months after the award had been paid that the members of the crew recanted their former sworn testimony and admitted under oath that they had not told the truth in the Board hearing. There was thus an issue of fact to be determined at the hearing in the district court as to whether the award by the Board was obtained by fraud and deceit. We hold that the instruction actually given by the court upon this subject was proper and was all that the appellant was entitled to upon the subject. It might be further pointed out that in any event the jury found in favor of Callan and against the railroad on this issue.

Appellant's next specification of error, No. 5, complains of the failure of the district court to give a proposed instruction offered by appellant concerning the knowledge and expertise of the members of the Adjustment Board. The proposed instruction is set out in the footnote.[4] A reading of this instruction shows that it is composed of conclusions and opinions which it would be improper to give to a jury. Such statements might properly be made in the course of an opinion discussing the findings of the Board, but they have no place in the instruction of a jury. The court instructed the jury properly on this subject.[5]

3. "If therefore, the jury finds from the evidence that respondent, Great Northern Railway Company, had knowledge of the facts, if any, which respondents claim were misrepresented by petitioner, prior to making this payment, the respondent cannot recover such payment from petitioner."

4. "The First Division of the Adjustment Board is composed of men with knowledge of the entire relationship and peculiar circumstances of the railroads and their employees, and it is in the first instance the proper agency to settle disputes and adjust differences between them. Its Findings bring to Court the weight of decision on the facts by men experienced in contracts, disputes and proceedings of this special and complicated character. These First Division members know the language, functions and purposes of railroads and of their collective agreements with their employees. Their judgment is informed by experience in negotiation and administering such contracts. They are specialists who may be assumed to have peculiar skill and knowledge, and who are acquainted with established procedures, customs and usages in the railroad labor world."

5. "I instruct you that by the petitioner Callan instituting this action in this court to enforce the award of the National Railroad Adjustment Board, he lays before this Court not only the question of whether or not the award has been complied with, but also the question of whether or not the award should be enforced or set aside.

"The findings of the Adjustment Board are prima facie evidence of the facts stated in the Board award order, but those findings may be rebutted by other evidence if, after considering all the evidence, you believe and rely upon such other evidence instead of upon such award order alone.

"Both sides have the right to introduce such other evidence as may be available to them as to the correctness of the award order, and after you consider all

Appellant's specification of error No. 6 complains of an instruction given by the court on the question of the burden of proof. We have set this instruction out in the margin.[6] We believe this instruction properly states the law. Thomas v. New York, C. & St. L. R. R., 185 F. 2d 614 (6th Cir. 1950).

The final specification of error made by appellant is that the court failed to submit special interrogatories to the jury. The matter of submitting special interrogatories to a jury is always within the sound discretion of the district judge, considering all of the circumstances of the case. We have examined the interrogatories offered by appellant and find no abuse of discretion on the part of the district judge in refusing to submit them to the jury.

The judgment of the district court is affirmed.

the evidence, both that of such order and that which additionally thereto may have been adduced at this trial before you by either or both sides, you are authorized and required to find the true material facts for yourselves.

"Where, as here, the correctness of said award order is disputed, the party disputing it has the burden of proving its incorrectness."

6. "Petitioner was entitled to reinstatement only if he was wrongfully discharged in the first place. He was wrongfully discharged only if some right arising out of contract or the law was violated by his discharge. The Railway Labor Act does not abrogate the employer's right to hire or discharge employees. The statute creates no right of continued employment.

"In this case the burden of proof is on the petitioner to prove his contentions, and the respondent has the burden of proof to establish its contentions respecting such order award."